Sharon Caldwell, Susan Jenkins, Patricia Ethun and Dana Ringhand, Plaintiffs-Appellants,
Wea Trust, Involuntary-Plaintiff-Appellant,
v.
J. H. Findorff & Son, Inc., Defendant-Third-Party Plaintiff-Respondent,
General Casualty Company of Wisconsin, Defendant-Third-Party Plaintiff,
v.
Maly Roofing Company, Inc., Continental Casualty Company, M.C.I., Inc., Acuity, A Mutual Insurance Company, Bruce Griffin and Security Insurance Company of Hartford, Third-Party Defendants.
No. 2004AP1157.
Court of Appeals of Wisconsin.
Opinion Filed: April 21, 2005.
Before Dykman, Vergeront and Lundsten, JJ.
¶1 DYKMAN, J.
The plaintiffs, employees of Yahara Elementary School in Deforest, appeal from a summary judgment dismissing their claims against J.H. Findorff & Sons, Inc., as barred by WIS. STAT. § 893.54(1) (2003-04),[1] a three-year statue of limitations. The plaintiffs sued Findorff for negligent construction of Yahara, which, the plaintiffs allege, led to excessive moisture and mold in the building, causing plaintiffs to experience respiratory symptoms and other problems. The circuit court concluded that the plaintiffs discovered the causes of their symptoms more than three years before the filing of this suit, making their claims time-barred. We disagree and conclude that the date the plaintiffs' discovered the causes of their injuries is a question of fact for a jury to decide.
¶2 In the alternative, Findorff argues we should affirm the circuit court's judgment, at least in part, on any or all of the following grounds: (1) the statute of repose in WIS. STAT. § 893.89 bars claims for damages suffered between April 29, 1994, and August 15, 1999; (2) the plaintiffs' claims under WIS. STAT. § 101.11, the safe place statute, fail as a matter of law because the submissions did not show that Findorff had custody or control of the premises; (3) the plaintiffs' negligence claims fail as a matter of law because none of their expert witnesses offered standard of care opinions regarding Findorff. We reject each of these contentions and remand for further proceedings.

BACKGROUND
¶3 The following undisputed facts are contained in the parties' affidavits. Findorff was the general contractor for the construction of Yahara Elementary School, which opened for the 1992-93 school year. Teachers Sharon Caldwell and Susan Jenkins, and custodian Patricia Ethun worked at Yahara from 1992 through the eventual remediation of the school in 2002. Teacher Dana Ringhand worked at the school from 1994 to 2001.
¶4 All of the plaintiffs developed respiratory symptoms and other problems soon after starting work at Yahara. Sharon Caldwell found it difficult to breathe in her classroom, developed asthma and respiratory infections, and experienced fatigue, headaches and muscle aches. Caldwell's symptoms would clear up when she was away from Yahara during summer breaks, but would return shortly after the start of school in the fall. In June 1993, Caldwell attended an environmental safety conference because she "was aware that there was something in the school's environmental that was making [her] not feel well." Caldwell's doctor ordered her in 1994 to stay home from school an extra day each week, though the doctor did not determine what in the school environment was causing her symptoms. In 1997, Caldwell discovered a one-foot square patch of fuzzy mold in a storage closet of her classroom. Both Caldwell and Susan Jenkins replaced carpeting in their homes with wood flooring out of concern that something in their homes was a source of their problems.
¶5 Jenkins experienced many of the same symptoms as Caldwell, including asthma, fatigue, headaches and sinus infections. These began in 1992 and were "pretty much out of control" by early 1999. Jenkins noticed that there were problems with the heating and cooling system in the building, and that her classroom was very humid and often had a strange odor. She placed an air purifier in her room in 1994 and a dehumidifier in 1998 or 1999. Upon returning from summer vacation in 1996, and then each fall until the 2002 remediation, Jenkins discovered mold in her classroom carpet. As Jenkins' symptoms worsened in 1998 and 1999, she came to "fe[el] that there was a relationship between mold and health." She requested that the carpeting in her classroom be replaced with linoleum because of the moldy odor.
¶6 Patricia Ethun experienced dizziness, allergies, bronchitis, eye irritation and breathing problems shortly after the school opened. Ethun had a history of migraines, but these increased in frequency and severity after she began working at Yahara. Within two to three years, she developed memory problems. As the custodian, Ethun changed the HVAC filters on a monthly basis when the building was new, which caused her to get headaches and to feel weak. In October 1992, she complained to her doctor that she thought she was suffering from "new building syndrome." Like Caldwell and Jenkins, Ethun discovered mold in the building. Two to three years after the school opened, she found mold on pipe wrapping in the ceiling, and on ceiling tiles. In summer 1993, she discovered mold on the carpets, and observed that during the summers mold would form after the carpets were cleaned.
¶7 Dana Ringhand developed allergies, eye irritation, headaches and runny nose in the winter of the 1994-95 school year, her first at Yahara. She described the humidity as "horrible" in the building, and did not believe that the air conditioning or heating worked properly.
¶8 Ringhand, Caldwell and Jenkins often complained to the custodial staff (including Ethun) about air-flow problems and excessive humidity in the building. They discussed their health problems with each other and other staff members. Custodial staff and administrators speculated that the humidity in the school was due in part to carpet cleaning over the summer break.
¶9 At the start of the 2001-02 school year, the district maintenance supervisor discovered mold in the building that could not be attributed to any readily ascertainable cause. The district hired Environmental Management Consultants, Inc., (EMC) to investigate potential mold and air quality problems. In April 2002, EMC released a report that found excessive levels of mold and moisture in the school and identified likely sources of the moisture and mold. The district immediately closed the building and hired a remediation team, which completed its work that August. During the remediation project, three, inch-wide gaps fifteen to twenty feet in length were discovered where the outside wall met the roof along the north side of the building. The HVAC engineer on the remediation, John Fredricksen, reported in a letter to the project architects that:
We also found what we believe is a more serious source of moisture [than another mentioned previously]. A condition exists behind the sheet metal fascia at the overhang. We observed a 1" gap between the Durock fascia and the wood nailer above. We suspect that this condition exists around the entire perimeter of the building. A gap also exists at the sheet metal fascia drip lip so that wind pressure can very easily drive outdoor air behind the sheet metal and through the spacing. We believe this could be a major source of building moisture.
He concluded: "We suggest that the soffit areas be very carefully inspected and that all envelope deficiencies be corrected. We can not expect the new HVAC systems to adequately dehumidify the building as long as an uncontrolled source of moisture exists."
¶10 On August 20, 2002, the plaintiffs sued Findorff under the safe place statute and in strict liability, alleging that defects in the original design and construction caused the excessive moisture in the building. The plaintiffs later amended their complaints to add negligence claims. Findorff moved for summary judgment. The circuit court determined that the plaintiffs failed to state a claim in strict liability. It also concluded that the plaintiffs had set forth viable claims under the safe place statute and in negligence, but that these claims were barred by WIS. STAT. § 893.54(1) because each plaintiff discovered their injuries and the causes of their injuries more than three years before filing suit. The court concluded:
The evidence shows that each of the Plaintiffs discovered that the Yahara building was making her ill well before August 20, 1999.... In their depositions, each Plaintiff testified that Yahara, from the start, had air ventilation problems and/or was humid and damp. They admit that because the onset of their physical ailments coincided with starting to work at Yahara, they attributed their symptoms to the building. Each one of the Plaintiffs took almost immediate, albeit largely unsuccessful, steps to address the problem. Furthermore, starting in the first year that Yahara opened, the staff shared with each other their concerns about the poor air quality in the building and the health problems it was causing. Finally, there was objective evidence that the humidity at Yahara was abnormal: patches of mold growing inside the school. The Court is satisfied that each Plaintiff "discovered" her claims well before three years of filing suit.
The plaintiffs have abandoned their strict liability claims, and appeal only from the court's conclusion that their negligence and safe place statute claims were not timely under Wisconsin's discovery rule.

STANDARD OF REVIEW
¶11 We review summary judgment de novo, applying the same method as the trial court. Green Spring Farms v. Kersten, 136 Wis. 2d 304, 315, 401 N.W.2d 816 (1987). Summary judgment is appropriate when no material factual dispute exists and the moving party is entitled to judgment as a matter of law. Schauer v. Baker, 2004 WI App 41, ¶4, 270 Wis. 2d 714, 678 N.W.2d 258. Summary judgment methodology requires that we first examine the pleadings to determine if a claim has been stated and if a material issue of fact is presented. Grams v. Boss, 97 Wis. 2d 332, 338-39, 294 N.W.2d 473 (1980). Then we "examine the affidavits and other proof of the opposing party to determine whether there exist disputed material facts or undisputed material facts from which reasonable alternative inferences may be drawn sufficient to entitle the opposing party to a trial." Voss v. City of Middleton, 162 Wis. 2d 737, 747, 470 N.W.2d 625 (1991). Under WIS. STAT. § 802.08(2), we must render summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

DISCUSSION

Actual Discovery of Claims
¶12 In tort actions, a statute of limitations period "will not accrue until the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, not only the fact of injury but also that the injury was probably caused by the defendant's conduct or product." Borello v. U.S. Oil Company, 130 Wis. 2d 397, 411, 388 N.W.2d 140 (1986). For discovery of an injury to occur, a prospective plaintiff must have "objective information to support [a] suspicion" about the cause of the injury. Jacobs v. Nor-Lake, Inc., 217 Wis. 2d 625, 636-637, 579 N.W.2d 254 (Ct. App. 1998). "A `subjective lay person's belief' as to the cause of an injury ... is insufficient" to establish that a plaintiff has discovered a claim "when a cause and effect relationship is not readily apparent." Id. at 637. However, the fact that a plaintiff's belief must have had an objective basis does not mean that an expert opinion regarding causation is necessary for a plaintiff to discovery the cause of an injury. Fritz v. McGrath, 146 Wis. 2d 681, 690, 431 N.W.2d 751 (Ct. App. 1988) ("[T]here is no requirement that [a plaintiff] have a full and specific `magic word' medical or legal opinion before the statute will be deemed to start running.").
¶13 We conclude that the affidavits raise a jury question as to whether the plaintiffs possessed sufficient objective information to discover the cause of their injuries prior to August 20, 1999. Undisputed facts taken from the affidavits support a reasonable inference that the plaintiffs believed that something in the school building environment caused their symptoms, but they lacked objective information about the particular cause prior to the 2002 EMC report and the subsequent remediation. Specifically, Caldwell averred that she believed that something in her classroom was making her sick, but her doctor could not determine what in the school building caused her allergies and asthma. When asked what she thought had caused her allergies, she stated: "Could be mold. Could be air quality. Could be chemicals that are in [my] art room, materials that are in an art room.... No one has said one thing specifically caused anything." Likewise, Ethun averred at different points that prior to 2002 she had suspected that mold was a potential cause of her symptoms. But when asked if her doctors or any other authorities had diagnosed a cause of her symptoms, she answered, "Not that I know of, not yet."
¶14 Additionally, Jenkins' deposition testimony that she believed that there was a connection between mold and health supports a view that this belief was subjective in nature:
Q [Findorff attorney]: When did you first know that mold could cause health problems?
A [Jenkins]: As my symptoms got worse.
Q: You said you have been looking for mold in your house for years. When did you first determine that mold could be dangerous to your health?
A: As I taught in Yahara and every fall when I went back, there was mold and I felt the effects of mold in the school.
Q: At some point in time you must have learned that there was a relationship between mold and health.
A: Are you asking me, did I read about it?
Q: Well, read about it, hear about it. All I'm looking for is when you first know that there was a relationship between mold and health.
A: As I lived it, as my health gradually declined, I felt there was a relationship between health and mold.
Q: When did you first make that connection?
A: As my health declined, probably 1998, '99.
¶15 Moreover, a statute of limitations will not run until a plaintiff discovers the injury was "due to wrongs committed by a particular, identified [party]." Pritzlaff v. Archdiocese of Milwaukee, 194 Wis. 2d 302, 315, 533 N.W.2d 780 (1995). The undisputed facts included in the affidavits show that whether the plaintiffs discovered the identity of Findorff as the alleged tortfeasor is also a question for the jury. Until the 2002 EMC report and the subsequent remediation, the plaintiffs considered school maintenance to be the possible cause of the environmental conditions in the building. The affidavits contain no direct evidence suggesting that the plaintiffsnone of whom possessed detailed knowledge about building constructionsuspected that a defect in the construction of the school building was the source of excessive moisture and mold. As we explain below, however, a jury could also reasonably determine that these plaintiffs, at some point between August 1993 and August 1999, should have discovered the identity of the party responsible for the conditions that promoted the excessive mold that caused their symptoms.

Reasonable Diligence
¶16 Because the circuit court concluded that the plaintiffs actually discovered their claims, it did not address whether they exercised reasonable diligence in attempting to discover them. Reasonable diligence is "such diligence as the great majority of persons would use in the same or similar circumstances." Spitler v. Dean, 148 Wis. 2d 630, 638, 436 N.W.2d 308 (1989).
¶17 We conclude that whether the plaintiffs should have discovered their claims by exercising reasonable diligence is also a question of fact for the jury. While the facts contained in the affidavits relevant to the issue of reasonable diligence are undisputed, these facts support conflicting reasonable inferences. Thus, the issue is for a fact-finder to decide. See Hennekens v. Hoerl, 160 Wis. 2d 144, 172, 465 N.W.2d 812 (1991) (Abrahamson, J. dissenting) (explaining that the reasonable person standard is an issue of "legal fact" for the fact-finder when undisputed historical facts may be subject to conflicting inferences or conclusions).
¶18 Here, a jury could reasonably conclude that each of the plaintiffs made a sufficient effort to discover the cause of their injuries. The plaintiffs took several actions that together might be construed as reasonable diligence. For example, they wrote to the administration about their belief that something in the school environment was causing them to become ill. Teachers Caldwell, Jenkins and Ringhand discussed with Ethun and other maintenance staff the potential causes of their symptoms; Caldwell attended a conference to learn about environmental hazards; Caldwell and Jenkins replaced carpeting in their own homes with wood flooring; Jenkins put an air purifier and a dehumidifier in her room. Significantly, each plaintiff sought the advice of medical professionals about the source of their symptoms. None of the plaintiffs' physicians were able to determine that the source of their symptoms was exposure to excessive mold.
¶19 Findorff contends the present case is distinguishable from two cases cited by the plaintiffs in which the courts determined that reasonable diligence was exercised, Borello, 130 Wis. 2d 397, and Jacobs, 217 Wis. 2d 625. There, the failure of the plaintiffs to discover the cause of their injuries was due in part to misleading advice from experts. Here, the plaintiffs were not similarly misled. However, a plaintiff who fails to discover her claims need not prove she was misled for a court to conclude that in her search for potential claims, she exercised reasonable diligence. See, e.g., Sawyer v. Midelfort, 227 Wis. 2d 124, 158, 595 N.W.2d 423 (1999); Goff v. Seldera, 202 Wis. 2d 600, 612 n.8, 550 N.W.2d 144 (Ct. App. 1996).
¶20 Conversely, a jury could also reasonably infer that the plaintiffs failed to exercise reasonable diligence, and that had they done so they would have discovered that excessive mold caused by Findorff's negligent construction was the source of their symptoms. Caldwell, Jenkins, Ethun and Ringhand all developed symptoms shortly after their first days of working in the new school building. From that time, plaintiffs Caldwell, Jenkins and Ethun had seven years to discover that design or construction of the new building was the cause of their injuries. Ringhand had five years in which to discover this potential cause. A jury could find that such a period of time was sufficient for a group of persons exercising reasonable diligence to have discovered the cause of their injuries.

Alternate Bases to Affirm the Circuit Court Decision
¶21 Findorff raises three alternate grounds on which the circuit court decision may be affirmed at least in part: (1) that WIS. STAT. § 893.89, a statute of repose, bars recovery for damages suffered between April 29, 1994, and August 15, 1999; (2) that the plaintiffs' safe place statute claims fail as a matter of law; and (3) that their negligence claims must also fail. The plaintiffs respond that because Findorff did not seek review of any part of the circuit court's ruling, it may not challenge the court's determinations that the plaintiff's complaint stated valid claims under the safe place statute and in negligence. However, it is well settled that a respondent need not file a cross-appeal to raise a question of error which, if corrected, would sustain the judgment on alternate grounds. State v. Alles, 106 Wis. 2d 368, 390, 316 N.W.2d 378 (1982). The plaintiffs also argue that because the circuit court did not reach Findorff's statute of repose defense, there is nothing for us to review on this issue. We again disagree. Because we are in as good a position as the trial court to address a summary judgment issue, we may reach the merits on the issues Findorff raises. Precision Erecting, Inc. v. AFW Foundry, Inc., 229 Wis. 2d 189, 197, 598 N.W.2d 614 (Ct. App. 1999).

1. Statute of Repose Defense
¶22 We consider first the statute of repose defense. WISCONSIN STAT. § 893.89 prohibits, with many exceptions, actions for injuries resulting from real property brought more than ten years after substantial completion of the improvement.[2] The facts relevant to this issue are undisputed. The plaintiffs brought suit on August 20, 2002. Findorff contends that the latest possible date of substantial completion of Yahara School is August 15, 1992, the date when instructional staff first worked in the building. Thus, Findorff asserts, the plaintiffs' claims were not timely brought under the ten-year statute of repose. Findorff notes that under § 893.89(4)(d) the statute does not apply to damages sustained prior to April 29, 1994. Further, it observes that under § 893.89(3)(b) a plaintiff may recover damages sustained after the first day of the eighth year of the exposure period up until the last day of the tenth year of that period if (a) the suit was brought after the ten-year exposure period but (b) within thirteen years of the date of substantial completion. Findorff argues that, as a result of these provisions, the plaintiffs may not recover damages sustained between April 29, 1994, and August 15, 1999. In their trial court brief, the plaintiffs contend that their suit was timely filed because August 26, 1992, the first day of classes of the 1992-1993 school year, was the date on which the school was substantially completed.
¶23 Because the facts necessary to decide the issue of the date when the statute of repose began to run are undisputed and do not give rise to multiple, conflicting inferences, the question is one of law. Therefore, relying on Holy Family Catholic Congregation v. Stubenrauch Assoc., Inc., 136 Wis. 2d 515, 402 N.W. 382 (Ct. App. 1987), we conclude that the school was substantially completed on August 26, 1992, the date when it was first used for instructional purposes. Like the present case, Holy Family concerned whether WIS. STAT. § 893.89, the statute of repose, barred suit, and turned on a determination of the date of substantial completion. We explained in Holy Family that "the date of occupation and use for [the building's] intended purpose is a significant factor in signaling a building's substantial completion." Id. at 524. We therefore held that a new church building that was the focus of the litigation in Holy Family was substantially completed when services were first held at the church, the date "the congregation first occupied the building for its intended purpose." Id. at 525. Here, because the intended purpose of a school building is student instruction, we conclude that the date of substantial completion is the date on which classes were first held at Yahara, August 20, 1992.[3] Thus, the plaintiffs' claims are not barred by § 893.89.

2. Safe Place Statute Claims
¶24 We turn next to Findorff's challenge to the plaintiffs' claims under WIS. STAT. § 101.11, the safe place statute. This statute provides in relevant part that "[e]very employer and every owner of a place of employment or a public building now or hereafter constructed shall so construct, repair or maintain such place of employment or public building as to render the same safe." Section 101.11(1). An owner includes "any person, firm, [or] corporation ... having ownership, control or custody of any ... public building, or of the construction, repair or maintenance of any ... public building ...." WIS. STAT. § 101.01(10).
¶25 Findorff contends that it is entitled to summary judgment on the safe place claims because the plaintiffs did not refute Findorff's prima facie case that during construction it did not have custody or control of the allegedly defective portions of the school building, citing Lemacher v. Circle Construction Co., Inc., 72 Wis. 2d 245, 240 N.W.2d 179 (1976). However, Findorff misreads WIS. STAT. § 101.11 and Lemacher. When a plaintiff suffers injury as a result of a permanent defect in the construction of a public building, § 101.11 does not require proof that a general contractor had control of the work site at the time of construction. A general contractor supervises and inspects the work of its subcontractors, and therefore has "control of the construction" for purposes of assigning liability for injuries resulting from permanent defects in construction.
¶26 In contrast, Lemacher involved a temporary condition at the construction site caused by a subcontractor, resulting in a construction worker's injury. Lemacher, 72 Wis. 2d at 248. Here, the alleged defect is a feature of the completed structure, and the injuries occurred after Findorff turned the building over to the district, and after the subcontractors completed their work. Finally, in Findorff's subcontracts, a subcontractor agrees that it retains control only "during actual performance of its on-Site work." This work was finished before Findorff delivered the completed structure to the district. We therefore reject Findorff's assertion that the plaintiffs' submissions do not entitle them to a trial on their safe place claims.

3. Negligence Claims
¶27 We turn finally to Findorff's assertion that the plaintiffs' negligence claims must fail as a matter of law because the plaintiffs did not present expert opinion statements establishing a standard of care. The circuit court determined that the plaintiffs' complaints stated valid negligence claims, but did not address whether the plaintiffs' affidavits contained expert opinions regarding the standard of care applicable to Findorff.
¶28 Expert opinions are generally necessary to establish standard of care in "those matters involving special knowledge or skill or experience on subjects which are not within the realm of the ordinary experience of mankind, and which require special learning, study or experience." Payne v. Milwaukee Sanitarium Found. Inc., 81 Wis. 2d 264, 276, 260 N.W.2d 386 (1977). We agree with Findorff that expert evidence is necessary here to establish a general contractor's standard of care when installing a soffit, or in supervising and inspecting a subcontractor's installation of a soffit, for a building of this type. However, we conclude that the HVAC engineer on the remediation project, John Fredricksen, whom plaintiffs named on their amended expert witness disclosure, offered deposition testimony contained in the plaintiffs' submissions about the relevant standard of care in this case.
¶29 Fredricksen averred that he discovered a series of one-inch gaps on the north side of the building near where the roof met the outside wall. Fredricksen stated that he had seen gaps like these in other projects where there were problems with "infiltration" of outside elements and "heat loss," and that gaps such as these were subsequently blocked. Fredrickson averred that the three gaps were of "differing lengths," did not appear to serve any useful purpose, and appeared to be "accidental." He also stated that the gaps were the result of a building material, Durock, not being pushed up tightly to the surface. He averred that in spots where there were no gaps, it was because the Durock was flush with the building surfaces.
¶30 Cumulatively, this deposition testimony and Fredricksen's letter to the project architect constitutes an opinion that a builder demonstrating ordinary care places materials flush with building surfaces when installing a soffit, and does not leave gaps between building surfaces and materials. The reason for this is that gaps will lead to "infiltration" and "loss of heat" in the building, and may also become a "serious source" of "uncontrolled moisture." Thus, the plaintiffs' submissions contain a showing as to the applicable standard of care.
By the Court.  Judgment reversed and cause remanded.
NOTES
[1] All references to the Wisconsin Statutes are to the 2003-04 version unless otherwise noted.
[2] WISCONSIN STAT. § 893.89 provides in relevant part:

(1) In this section, "exposure period" means the 10 years immediately following the date of substantial completion of the improvement to real property.
(2) Except as provided in sub. (3), no cause of action may accrue and no action may be commenced ... against any person involved in the improvement to real property after the end of the exposure period, to recover damages ... for any injury to the person ... arising out of any deficiency or defect in the design ... supervision or observation of construction of, [or] the construction of ... the improvement to real property ....
(3)(a) Except as provided in pars. (b) and (c), if a person sustains damages as the result of a deficiency or defect in an improvement to real property, and the statute of limitations applicable to the damages bars commencement of the cause of action before the end of the exposure period, the statute of limitations applicable to the damages applies.
(b) If, as the result of a deficiency or defect in an improvement to real property, a person sustains damages during the period beginning on the first day of the 8th year and ending on the last day of the 10th year after the substantial completion of the improvement to real property, the time for commencing the action for the damages is extended for 3 years after the date on which the damages occurred.
....
(4) This section does not apply to any of the following:
....
(d) Damages that were sustained before April 29, 1994.
(5) Except as provided in sub. (4), this section applies to improvements to real property substantially completed before, on or after April 29, 1994.
[3] Findorff contends that substantial completion occurred on August 15, 1992 at the latest, the date of the teachers' first day of work at the school that year. It argues that the test for substantial completion is "when control over the improvement is shifted from the builder to the owner," Holy Family Catholic Congregation v. Stubenrauch Assoc., Inc., 136 Wis. 2d 515, 523, 402 N.W. 382 (Ct. App. 1987), and that the builder ceded control over the facility on the date when the teachers began to work there. We acknowledge that Holy Family uses the concepts of "control," "occupation" and "use for its intended purpose" almost interchangeably. See, e.g., Holy Family, 136 Wis. 2d at 523 ("A convenient and fair measure of the time when control over the improvement shifts from the builders to the owner is the date when construction is sufficiently completed so that the owner or his representative can occupy or use the improvement for the use it was intended") (citation omitted). However, the result of Holy Family dictates the outcome here. We did not rule in Holy Family that the building was substantially completed when the monsignor was able to work in the building, but rather when the first services were held there. Accordingly, we have held that substantial completion occurred here when the school was first used for instructional purposes.